UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **DAVID LLOYD** | * | **CIVIL ACTION NO. 10-0920** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

### Background & Procedural History

David Lloyd filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on July 5, 2006. *See* Tr. 36, 94-96. He alleged disability as of November 1, 2005, because of heart problems. (Tr. 101, 106). The applications were denied at the initial stage of the administrative process. (Tr. 73-77). Thereafter, Lloyd requested and received an August 4, 2008, hearing before an Administrative Law Judge ("ALJ"). (Tr. 279-292). However, in an October 9, 2008, written decision, the ALJ determined that Lloyd was not disabled under the Act. (Tr. 33-41). Accordingly, Lloyd appealed the adverse decision to the Appeals Council. On April 24, 2009, the Appeals Council granted Lloyd's request for review, vacated the ALJ's decision, and remanded the case for further

proceedings. (Tr. 48-50).

Upon remand, the ALJ held a new hearing on September 10, 2009. (Tr. 255-278). In a November 10, 2009, partially favorable decision, the ALJ awarded disability benefits with an onset date of August 1, 2009. (Tr. 11-24). However, he denied disability for the period prior to August 1, 2009, finding at Step Five of the sequential evaluation process that Lloyd was able to make an adjustment to work that exists in substantial numbers in the national economy. *Id.* Lloyd appealed the adverse decision to the Appeals Council, but to no avail. *See* April 26, 2010, Notice of Appeals Council Action, Tr. 7-9. Therefore, the ALJ's decision became the final decision of the Commissioner. *Id.*

On June 11, 2010, Lloyd sought review before this court. He alleges the following errors,

(1) the ALJ erred by failing to find that his impairments medically equaled or were equivalent to a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(2) the ALJ's residual functional capacity assessment is not supported by substantial evidence.

**Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a

preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite

>   duration will not be found disabled.
>
> (3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.
>
> (4)   If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.
>
> (5)   If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

See *Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I.  Steps One, Two, and Three

The ALJ determined at Step One of the sequential evaluation process that Lloyd did not engage in substantial gainful activity during the relevant period. (Tr. 18). At Step Two, he found that Lloyd suffers severe impairments of ventricular septal defect; cervical degenerative disc disease; and obesity. *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. *Id*.

Plaintiff contends that he suffers from severe impairments of the cardiovascular system that meet or equal the criteria of an unspecified listing in Appendix 1, Subpart P, Regulations No. 4. The court observes that to establish that a claimant's injuries meet or medically equal a listing, the claimant must provide medical findings that support all of the criteria for a listed impairment (or most similarly listed impairment). *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990). If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that Listings-level impairments are not present. *Selders*, 914 F.2d at 620.

In the case *sub judice*, plaintiff has not identified any listing that he purports to meet or equal, nor has he demonstrated that he meets or equals all of the criteria of any given listing. Accordingly, the court finds that the ALJ's Step Three determination is supported by substantial evidence. *See Selders, supra*; *McCuller v. Barnhart*, 72 Fed. Appx. 155 (5th Cir. 2003) (unpubl.).[1]

## II. Residual Functional Capacity

The ALJ next determined that, prior to August 1, 2009, Lloyd retained the residual

---

[1] Furthermore, when determining whether an impairment medically equals a listing, the Commissioner considers all relevant evidence in the record. 20 C.F.R. § 404.1526(c). While a claimant's residual functional capacity to engage in substantial gainful activity is not dispositive of the Step Three inquiry, *see* 20 C.F.R. Subpart P, App. 1, Section 1.00H(4), the listings nonetheless represent impairments that the Commissioner deems severe enough to prevent an individual from performing any gainful activity, regardless of the individual's vocational background. 20 C.F.R. § 404.1525(a). Moreover, an individual whose impairment(s) meets or equals a listed impairment is presumed unable to work. *Sullivan*, 493 U.S. at 532, 110 S.Ct. at 892. Thus, a claimant's ability to work may provide a useful shorthand gauge to measure the severity of a claimant's impairments for purposes of medical equivalence.

functional capacity to perform light work, except that he could only stand/walk for up to four hours in an eight hour day; sit for up to six hours; occasionally climb ramps/stairs, but no climbing of ladders/scaffolds; occasionally balance, stoop, kneel, and crouch, but no crawling; occasionally reach overhead; no working around hazards (dangerous machinery, unprotected heights, etc.), dust, fumes, gases, odors, poor ventilation, etc.; and no working at extremes of heat, wetness, or humidity. (Tr. 19).[2]  Beginning on August 1, 2009, the ALJ determined that plaintiff retained the residual functional capacity for the full range of sedentary work. (Tr. 21).

      a)      <u>Chronology of Relevant Medical Evidence</u>

From August 20-23, 1999, Lloyd was hospitalized for chest pain. (Tr. 134). He was diagnosed with ventriculoseptal defect ("VSD"); left to right shunt; and chest pain, with possible coronary artery disease. *Id*. He was ruled out for myocardial infarction (i.e. heart attack). *Id*. However, he adamantly decline to undergo a heart catheterization. *Id*. Notes reflect that Lloyd was born with a murmur. (Tr. 138). Upon examination, on August 20, 1999, he did not have a murmur. *Id*. On August 21, 1999, however, Dr. Mouhaffel discerned a heart murmur. (Tr. 141).

---

[2] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

A September 13, 1999, echocardiogram showed normal left ventricular systolic function with ejection fraction of 60%. (Tr. 135). Trivial mitral regurgitation and trivial aortic insufficiency was observed. *Id*. An August 20, 1999, chest x-ray revealed no acute cardiopulmonary process. (Tr. 143).

There was a gap in the medical records from 1999 until 2006. On May 1, 2006, however, Lloyd complained of dyspnea on exertion, chest pain with exertion, occasional dizziness, and left arm numbness. (Tr. 165-167). He weighed 234 pounds and was 6'0 tall. *Id*. (Tr. 167). Dr. Mouhaffel diagnosed systolic murmur, mild VSD, and chest pain. *Id*. On May 5, 2006, Lloyd had an ejection fraction of 46%. (Tr. 162). Also, a May 5, 2006, chest x-ray indicated that Lloyd's cardiac silhouette was normal in size. (Tr. 169).

On August 24, 2006, Lloyd underwent a physical examination administered by consultative physician, Ken Barrick, M.D. (Tr. 170-174). Barrick noted that Lloyd complained of daily chest pain that was sharp and stabbing. *Id*. His pain was exacerbated by exertion, but improved with rest. *Id*. Lloyd also reported shortness of breath with exertion. *Id*. He stated that he experienced a burning pain in his shoulders and neck. *Id*. He denied loss of consciousness. *Id*. He complained of low back pain, no knee pain, thigh pain, and neck and shoulder pain. *Id*. At the time of the examination, he weighed 226 pounds and was 6'1" tall. *Id*. Upon examination, Barrick discerned no murmur. *Id*. Lloyd exhibited a normal gait, and was able stand on tiptoes, and heel and tandem walk, without problem. *Id*. He also could bend and squat, without difficulty. *Id*. He exhibited 5/5 grip strength, with adequate fine motor movements, dexterity and ability to grasp objects bilaterally. *Id*. Barrick discerned no edema in the extremities. *Id*.

Barrick diagnosed, per records, that Lloyd had a VSD; atypical chest pain, with negative

7

heart attack history; medical non-compliance; and possible angina, but unclear. *Id*. Barrick noted that Lloyd's height and weight were consistent with borderline obesity. *Id*. No shortness of breath or abnormal breath sounds were noted. *Id*. Range of motion was normal in all joints. *Id*. No clinical examination findings demonstrated that he had functional problems from his stated heart condition. *Id*. Barrick noted that the provided medical records showed that he was ruled out for having heart attack. *Id*. Barrick opined that a pathologic shunt was unlikely to be causing his presenting complaints. *Id*. He further opined that Lloyd should be able to sit, walk and/or stand for a full workday with adequate rest breaks, lift/carry objects of at least 20 pounds, hold a conversation, respond appropriately to questions, and carry out and remember instructions. *Id*.

On September 18, 2006, Susan Snell completed a physical residual functional capacity assessment indicating that Lloyd was able to perform medium work. (Tr. 175-182). However, she is a disability examiner, not a medical consultant. *See* Tr. 73.

From April 15-17, 2007, Lloyd again was hospitalized. (Tr. 184). He was discharged with resolved chest pain, VSD, shoulder trauma, and an abnormal stress test, for which Lloyd refused any further cardiac work up. *Id*. A new echocardiogram indicated an ejection fraction of 50%. *Id*. Lloyd had a small VSD, with a very small left to right shunt noted. *Id*.

Hospital admission notes from April 15, 2007, reveal that in October 2006, Lloyd apparently suffered an injury while at work, falling on his right shoulder, with a heavy object falling and hitting his head. (Tr. 185-187). He had been off of work since that time. *Id*. He had been doing fairly well since the stress test last year in Mouhaffel's office. *Id*. He had no chest pain or shortness of breath until this admission. *Id*. Physical therapy had helped his right shoulder pain, but it continued. *Id*. He complained of right arm pain, right shoulder pain, and

the inability to lift his arm over his head. *Id*. Upon examination, he had a regular heart rate and rhythm. *Id*.

An April 17, 2007, cervical MRI indicated moderate spondylosis of the C5-6 disc space, with moderate -prominent uncinate process hypertrophy and mild disc protrusion resulting in moderate central and lateral stenosis. (Tr. 202-203). There also was slight disc bulging or protrusion at the C4-5 and C6-7 levels, but with no impressive stenosis. *Id*.

An April 17, 2007, right shoulder MRI showed moderate acromioclavicular joint hypertrophy, with mild impingement; mild subacromial bursitis, and moderate tenosynovitis of the biceps tendon and slight tendonitis of the supraspinatus tendon. (Tr. 204-205).

An April 18, 2007, echocardiogram showed mildly enlarged left atrium, mild mitral regurgitation, trace tricuspid regurgitation, mild diffuse left ventricular hypokinesis, left ventricular systolic function at lower limits of normal with estimated ejection fraction around 50%, small VSD with small left to right shunt, trace pericardial effusion, and atheroslecerotic changes of the aortic valve. (Tr. 206).

The record contains an undated residual functional capacity questionnaire that Dr. Mouhaffel apparently mailed to plaintiff's counsel at the end of May 2007. (Tr. 244-245; *see also* Pl. Exh. A). The questionnaire was based on diagnoses for VSD, hypertension, dyspnea, and chest pain. *Id*. Lloyd's symptoms included difficulty remembering, weakness, confusion, pain, falling spells, fatigue, nausea, and lightheadness. *Id*. Emotional factors contributed to his symptoms and functional limitations. *Id*. His pain and fatigue would frequently interfere with his attention and concentration. *Id*. His impairments were expected to last for at least 12 months. *Id*. He needed to shift positions at will. *Id*. He was going to be ill about four days per month, and needed to take unscheduled rest periods during the day. *Id*. Also, during periods of

prolonged sitting, he needed to elevate his legs. *Id*. Mouhaffel opined that Lloyd could frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. *Id*. He could occasionally twist, stoop (bend) and crouch, and rarely climb stairs and ladders. *Id*. He had to avoid concentrated exposure to environmental irritants. *Id*.

After remand from the Appeals Council, the ALJ sought updated medical records from Dr. Mouhaffel and asked him to complete a medical source statement. (Tr. 58-61). On July 10, 2009, Mouhaffel completed a medical source statement, but it reflected Lloyd's condition as of December 27, 2007, when he was last seen in Mouhaffel's office. *Id*. This time, Mouhaffel indicated that plaintiff could continuously lift and carry up to 20 pounds, frequently lift and carry up to 50 pounds, and occasionally lift and carry up to 100 pounds. *Id*. Lloyd could sit, stand, and walk for up to four hours at a time, for a total of six hours standing/walking in an eight hour work day, and eight hours sitting. *Id*. He did not need the use of a cane. *Id*. He occasionally could perform postural limitations; with occasional exposure to dusts, odors, fumes and temperature extremes, and frequent exposure to other environmental conditions. *Id*. Mouhaffel did not impose any other limitations. *Id*. Mouhaffel indicated that the assessment was supported by a stress test that indicated a fixed, inferior defect with an ejection fraction of 46%, and an echocardiogram with a mild, enlarged atrium, small VSD, and atherosclerotic changes of the aortic valve. *Id*.

On August 17, 2009, Lloyd was hospitalized overnight, with chest pains and shortness of breath. (Tr. 68-71). He weighed 242 pounds at the time. *Id*.

  b) <u>Discussion</u>

In his decision, the ALJ credited Dr. Mouhaffel's July 2009 medical source statement over Mouhaffel's earlier May 2007 statement. In so deciding, the ALJ noted, *inter alia*, that the

more recent source statement was more consistent with Mouhaffel's own records, which did not reveal any limitation of functioning, and with the assessment of the consultative physician. The ALJ nonetheless limited the weight that he afforded to Mouhaffel and Barrick's opinions because he believed that neither of them considered the effect of plaintiff's obesity. (Tr. 21). Because of Lloyd's obesity, the ALJ decided that it was necessary to reduce his residual functional capacity for the period prior to August 1, 2009. *Id*. The ALJ also ultimately reduced plaintiff's residual functional capacity to sedentary as of August 1, 2009, because of the ALJ's appreciation of the apparent progression of his heart disease which led to Lloyd's overnight hospitalization in August 2009.

Plaintiff, quite understandably, contests the ALJ's residual functional capacity assessment. He first argues that the ALJ erred in finding that he could perform light work, because the ALJ determined that Lloyd could only stand and/or walk for up to four hours in an eight hour work day. However, the ALJ did not determine that Lloyd could perform the *full range* of light work. Rather, when, as here, the residual functional capacity falls between exertional levels, the ALJ is required to consult vocational sources. *See* SSR 83-12. Of course, that is precisely what the ALJ did – he posed a hypothetical to a vocational expert, that included the walking and standing limitation, plus other limitations. *See* Tr. 277-278.

Plaintiff further contends that the ALJ erred by finding that Lloyd had severe impairments of cervical degenerative disc disease and obesity. (Pl. Brief, pg. 8). He emphasizes that there is no statement in the record to support these diagnoses. *Id*. Indeed, while diagnostic testing appears to provide objective support for cervical and shoulder impairments, *see* Tr. 202-205, plaintiff correctly observes that no physician diagnosed a cervical impairment. Thus, the ALJ erred when he determined that plaintiff suffered from the severe, medically determinable

impairment of cervical degenerative disc disease. *See* 20 C.F.R. § 404.1513 (only evidence from acceptable medical sources, i.e., typically, licensed physicians and psychologists, may be used to establish a medically determinable impairment). Any error was harmless, however, because at the second hearing, plaintiff conceded that it was his heart that he was worried about, not his back. (Tr. 268).

With regard to the ALJ's finding that plaintiff suffered from obesity, the court observes that the record contains a diagnosis by Dr. Barrick that plaintiff suffers from borderline obesity. While this diagnosis provides support for the ALJ's determination that plaintiff suffers from obesity, it also undercuts the ALJ's finding that the treating[3] and consultative physicians did not contemplate the effects of plaintiff's obesity in their opinions regarding his functional limitations.

However, to the extent that the ALJ erred by sua sponte reducing Lloyd's functional capacity beyond the limitations recognized by Drs. Barrick and Mouhaffel (in his second medical source statement),[4] the error was harmless because even with the reduced functional capacity employed by the ALJ, Lloyd still was able to make an adjustment to other work that exists in

---

[3] Dr. Mouhaffel's treatment records document plaintiff's weight and height; thus, he implicitly considered these factors in his medical sources statement(s).

[4] Although not argued by plaintiff, the court observes that the September 18, 2006, physical residual functional capacity assessment form ostensibly completed by a state agency physician, was, in fact, completed by a state disability examiner. A disability examiner is not a medical doctor, and her opinion is not considered an acceptable medical source statement or afforded the same weight as an opinion of a medical or psychological consultant of the state agency. *See* 20 C.F.R. §§ 416.927(f) and 416.913(a)-(d). However, to the extent that the ALJ mistakenly relied upon the assessment of the disability examiner, any error was harmless, because the opinions of the consultative physician and the treating physician provide substantial support for his ultimate finding that plaintiff was not disabled during the relevant period. *See* discussion, *infra*.

substantial numbers in the national economy. *See* Tr. 276-278.[5] *A fortiori*, the un-reduced limitations imposed by Drs. Barrick and Mouhaffel (in his second medical source statement) are consistent with at least light work, and do not undermine the ALJ's Step Five determination.

The court further observes that while it was reasonable for the ALJ to surmise that the cumulative effect of plaintiff's heart condition and obesity would decline over time, plaintiff stated on his disability report in May 2008, that his impairments had not changed or worsened since his last disability report completed in July 2006. *See* Tr. 128. Further, there is no record that plaintiff was hospitalized for his heart problems between the time of the April 2007 hospitalization and the August 2009 hospitalization. These circumstances combine to provide substantial support for the ALJ's implicit determination that plaintiff's functional limitations remained materially static between the time of the alleged onset date and his hospitalization in August 2009.[6]

Thus, the critical issue before the court is whether the record substantially supports the ALJ's decision to credit the opinion of Dr. Barrick and to give effect to Mouhaffel's second medical source statement. Plaintiff faults Dr. Barrick's findings, because plaintiff was unable to

---

[5] *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (procedural perfection in administrative proceedings is not required); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).

[6] Plaintiff argues that his hospitalization in August 2009 was relatively benign, and that if the hospitalization sufficed to demonstrate that plaintiff was only capable of sedentary work, then the same evidence should have supported an earlier disability onset date. Plaintiff's argument, however, is a double-edged sword. It is apparent to the court that rather than obtain an updated consultative examination after Dr. Mouhaffel's retrospective 2009 medical source statement, the ALJ generously decided to award benefits as of August 2009. If the court were to reverse the ALJ's decision for the period prior to August 1, 2009, for lack of substantial evidence, the same deficiencies would undermine the basis for the ALJ's favorable decision for the period beginning on August 1, 2009.

subpoena the x-ray charts and EKG tracings that informed Barrick's opinion. *See* Pl. Brief, Exh. B. However, a May 5, 2006, chest x-ray indicated that Lloyd's cardiac silhouette was normal in size. (Tr. 169). Furthermore, Dr. Barrick did not mention an ejection fraction in his opinion; rather, the disability examiner referred to the ejection fraction in her non-medical assessment. *See* Tr. 176. In fact, despite plaintiff's protestations that he suffered from a disabling heart impairment, he apparently continued to work odd jobs until at least October 2006. *See* Tr. 185-187. Furthermore, until the time of his April 2007, hospitalization for chest pain, Lloyd told Dr. Mouhaffel that he had been doing fairly well since he last saw Mouhaffel in May 2006. *Id*.

With regard to the ALJ's decision to credit Dr. Mouhaffel's 2009 retrospective medical source statement, the court observes that conflicts in the evidence are for the Commissioner to resolve. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citations and internal quotation marks omitted). The ALJ reasoned, in part, that Mouhaffel's subsequent medical source statement was more consistent with Mouhaffel's own records which did not reflect any limitation of functioning, and because it coincided with Dr. Barrick's assessment. The court adds that Mouhaffel provided his initial assessment not long after Lloyd's April 2007 hospitalization, and Mouhaffel might have thought, at the time, that his impairments would be more extensive and limiting than they proved to be. Furthermore, by 2009, Lloyd was no longer a patient of Dr. Mouhaffel, and thus, it is conceivable that Mouhaffel was free to provide a more objective assessment of Lloyd's limitations, freed from the pressure of an ongoing physician-patient relationship. Be that as it may, the record contains substantial support to justify the ALJ's resolution of the conflicting evidence.

For purposes of Mouhaffel's conflicting opinions, plaintiff argues that the ALJ failed to fully and fairly develop the record. However, the ALJ's failure to adequately develop the record

does not automatically warrant reversal. *Kane v. Heckler*, 731 F.2d 1216, 1219-1220 (5th Cir. 1984). The claimant still must demonstrate that he was prejudiced thereby. *Id*. "To establish prejudice, a claimant must show that he could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726,728 (5th Cir. 1996) (internal quotes omitted); *Kane, supra*. In other words, he should proffer the omitted evidence to the district court. *Kane, supra*. Despite being represented by able counsel at the time of the hearings and on appeal, plaintiff has not proffered any other evidence that would undermine the ALJ's decision.

Relatedly, to the extent that it could be argued that the ALJ was compelled to re-contact Dr. Mouhaffel one more time, the court finds that the ALJ was not so obliged. The Fifth Circuit has recognized that "if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, *absent other medical opinion evidence based on personal examination* or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis added). Because the instant record contains medical opinion evidence from an examining physician, Dr. Barrick, the ALJ was not obliged to recontact Dr. Mouhaffel. *See Holifield v. Astrue*, 402 Fed. Appx. 24 (5th Cir. Nov. 10, 2010) (unpubl.) (no need to recontact where the record contained medical opinion evidence from other treating physicians).[7] Dr. Barrick's opinion also obviated the need for the ALJ to consider the criteria set forth in 20 C.F.R. § 404.1527(d)(2) before declining to credit Dr. Mouhaffel's

---

[7] Even if the ALJ was obliged to re-contact Mouhaffel, as stated previously, an ALJ's failure to adequately develop the record does not automatically compel reversal. *Hyde v. Astrue*, Docket No. 07-30748 (5th Cir. May 12, 2008) (unpubl.) (citing *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984)). Rather, plaintiff must demonstrate resulting prejudice. *Brock, supra*. Mere speculation that additional evidence might have made a difference does not suffice. *Hyde, supra*. Plaintiff has not made that showing here.

initial assessment. *Holifield, supra* (citation omitted) (ALJ not required to perform detailed analysis of § 404.1527(d)(2) factors where the record contains reliable medical evidence from another examining physician); *see also Bullock v. Astrue*, 2007 WL 4180549 (5th Cir. 11/27/2007) (unpubl.).

### III.     Steps Four and Five

The ALJ concluded at Step Four of the sequential evaluation process that Lloyd could not perform his past relevant work. (Tr. 22). Accordingly, he proceeded to Step Five. At this step, the ALJ determined that plaintiff was an individual closely approaching advanced age, with a high school education, and that prior to August 1, 2009, transferability of skills was immaterial. *Id*.

With the assistance of a vocational expert, the ALJ determined that, for the period prior to August 1, 2009, there were a substantial number of jobs that existed in the national economy that plaintiff still could perform, given his vocational factors and residual functional capacity. (Tr. 22-23). Indeed, plaintiff does not allege any error with the Commissioner's Step Five finding, independent of his challenge regarding the sufficiency of the ALJ's residual functional capacity assessment.

### Conclusion

The ALJ in this case was tasked with determining whether plaintiff was disabled. In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence was not uniform and could have supported a different outcome. However, conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or

substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra.*[8] That is not to say that the ALJ's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that prior to August 1, 2009, plaintiff was not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, in its entirety, and that this civil action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS**

---

[8] Admittedly, this court has expanded upon some of the reasoning given by the Commissioner for his decision. Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id.* This exception is applicable here. Further, the Fifth Circuit implicitly has sanctioned the federal courts' practice of assigning independent reasons for discounting newly adduced evidence. *See e.g., Foster, supra; Garth v. Astrue*, 393 Fed. Appx. 196 (5th Cir. Aug. 26, 2010) (unpubl.).

**REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 7th day of December 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE